Filed 1/3/24  P. v. Malloy CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDWARD MALLOY,<br><br>    Defendant and Appellant. | B317367<br><br>(Los Angeles County<br>Super. Ct. No. BA497927) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ray G. Jurado, Judge.  Affirmed in part, reversed and remanded in part with instructions.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Stefanie Yee, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

Appellant Edward Malloy admitted attempting to murder one man and killing another. Following a jury trial, he was convicted of attempted first degree murder (Pen. Code, §§ 187, subd. (a), 664),[1]murder (§ 187), two counts of possession of a firearm by a felon (§ 29800, subd. (a)(1)), and shooting at an occupied motor vehicle (§ 246).

On appeal, Malloy challenges his conviction for murder, asserting that the People did not overcome his claim of imperfect self-defense, and that there was insufficient evidence of premeditation and deliberation. We find that substantial evidence supports the jury's findings, and affirm.

Malloy also contends that one of his convictions for possession of a firearm by a felon must be reversed, because his possession of the firearm was continuous, and therefore could lead to only a single conviction. The People concede that one of these convictions must be reversed. We agree, and reverse one of the two possession convictions.

Malloy also argues, and again the People concede, that remand for resentencing is warranted due to recent changes to section 1170, and that other changes to sentencing laws may affect his resentencing. Again we agree, and remand the matter for resentencing. The judgment is otherwise affirmed.

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

**FACTUAL AND PROCEDURAL BACKGROUND**

The People filed an information alleging five counts against Malloy: attempted murder of D.S.[2] on June 5, 2017 (count 1), the murder of James Oliver on June 25, 2017 (count 2), two counts of possession of a firearm by a felon (counts 3 and 4), and shooting at an occupied motor vehicle (count 5). The case proceeded to trial in November 2021.

**A. Facts**

Malloy admitted that he tried to kill D. and that he shot Oliver. Malloy's two substantive arguments relate to the murder conviction regarding Oliver. He contends the prosecution's evidence did not overcome his defense of imperfect self-defense, and that the evidence did not demonstrate that the shooting was deliberate and premeditated. We therefore focus on the evidence presented at trial relevant to those arguments.

**1.** *Background and origin of dispute*

The shootings occurred in the Skid Row neighborhood of Los Angeles. Los Angeles Police Department (LAPD) officer Deon Joseph testified that in the 50-block area of Skid Row, "every street is controlled by a different gang. They kind of divvy up the territory. So . . . different drug dealers control different sectors." Joseph said drug territory disputes were common, and the "narcotics game" is operated "though intimidation and violence . . . especially in the Skid Row area." Some drug dealers charged "rent" to allow people to live in tents on certain sections of

---

2       We refer to the living victim and witnesses using initials to protect their privacy. (See Cal. Rules of Court, rule 8.90(b)(4).) D.S. was known as "D." and "Cookie D."; we refer to him as "D." herein. The quotations herein often use non-standard grammar, and we have refrained from including [*sic*] in most quotes.

3

sidewalk.  The area where D.'s shooting occurred was "a high traffic drug area."

A recording of an interview with D. from December 3, 2019 was played for the jury.[3]  In the interview, D. discussed his "territory" in the Skid Row area, and said that "[p]eople want in, they want in. And [Malloy] was one of the ones that wanted in, as far as the heroin trade."  D. said that within his territory, "anybody I catch right there, doing their thing, selling heroin or white cocaine, they already know what it is, you know what I mean?  Hey it's like, if you're not getting it from me, you can't do it right here."  "And that was the situation with" Malloy's girlfriend, Angela Johnson, so "[i]t was my people that approached her" to say "you in violation, you have to move on with that."  "And that's [what] led [Johnson] up to her lying" to Malloy.  D. said that Johnson "tried to put it out there that I raped her. . . .  Which is not true."

Malloy's recollection of events was different. He testified at trial that in 2015, Johnson switched from selling crack to selling heroin.  When D. "found out that [Johnson] wasn't selling crack no more and she was selling heroin, he changed his game. He started selling heroin, because he seen how much money was brought in.  [¶] When [Johnson] would not turn him on to her connection, he got upset and he set her tent on fire."[4]  In D.'s

---

[3]     The quotes from this and other interviews are taken from the transcripts prepared for trial, not the audio and/or video recordings.

[4]     In an interview with police on July 11, 2017, which was played for the jury, Malloy said there was a "heroin scene" in a certain area, and "individuals" in the area "pressed" Johnson to "make her pay rent."  He said the "individual that's pressing her

4

interview with police, he denied knowing anything about Johnson's tent being burned.[5]

Malloy testified at trial that he had lived in the Skid Row area for 20 years; he lived in a tent on 6th Street. Malloy testified that there is a "mayor" of Skid Row, who "manage[s] the areas . . . where certain people put up their tents and where certain people live." When Malloy was incarcerated in 2015, "Deacon" was the mayor; when Malloy was released in 2017, D. was the mayor. Malloy testified that he spoke with D. the day he was released from custody to determine where he could set up his tent.

Malloy told police that he and Johnson had "corresponded" about Johnson's issues with D. while they were both in custody, and when they were both released in 2017, Malloy offered Johnson protection. So when Malloy approached D., he also spoke to him about Johnson: "I come to him like a man, I say, bro, so there'll be no disrespect, tell me where is your, your boundaries," so if Johnson "wants to go back, get back in the game, she won't step on your toes." D. defined his boundaries, and Malloy responded, "[D]on't worry about nothing. I'll control her."

In his interview with police, D. said that after Malloy was released from custody in 2017, he "wanted my area, and it [led] up to animosity. Instead of him wanting to fight me . . . he tried to use [Johnson] as an excuse." D. also said that when Malloy approached him, Malloy tried to get D. to discuss an issue

---

couldn't get her . . . to pay rent," so "in 2015 he burned her tent up" and "rat[ted] on her" so she "gets busted for sales of heroin."

[5] In the interview transcript in the record on appeal, there is a page missing just after D. began discussing this issue.

regarding a gang member, even though discussing that issue "can get you killed." D. said that if he had talked about the issue with Malloy, "he could put it out there hoping that he won't have to end up trying to kill me," because the gang would "send people at me, to take care of me." D. said this conversation tipped him off that Malloy had a problem with him.

2. *Attempted murder of D.*

Malloy testified that in June 2017, he learned from an acquaintance that D. "was upset with me and my girl [Johnson] and that he was going to put a bullet in me, my girl and anybody who socialized with us." Malloy immediately bought a revolver and acquired ammunition. He then went to his friend Rick "and asked him if Cookie D was packing a pistol." Within 45 minutes of hearing that D. had threatened him, Malloy—now armed, with his gun loaded and concealed in a sock—went to find D. "[t]o discuss the fact that we had an agreement, and I kept my part of the bargain" that Johnson "wouldn't be in his area."

C.S., D.'s wife, testified that on the morning of June 5, 2017, she and D. were in the Skid Row area, sitting in a parked Porsche Cayenne. D. was in the driver's seat, C.S. was in the passenger seat, and the windows were rolled down. C.S. testified that someone approached the vehicle from behind, and "all of a sudden gunshots came and my husband . . . ended up getting shot" in the mouth.[6]

---

[6] C.S. was a reluctant witness, and initially testified that she did not recall D. being injured, did not recall seeing anyone approach the vehicle, and did not recall certain details she told police. LAPD detective Brad Golden said there were additional people in the area at the time of the shooting, but he and Officer Joseph testified that it was common in the Skid Row area for witnesses to not cooperate with law enforcement.

D. told police that on the day of the shooting, he was in the Cayenne and saw Malloy and Johnson across the street on bikes. D. said he "didn't think nothing of it, because . . . he didn't lock eyes with me." Malloy left, returned to the area, approached D. from behind, and said to D., "Now what?" D. was looking down, texting, and C.S. said, "What is you doing?" D. looked up and C.S. "grabbed the gun, which had a black sock on it. . . . And when she grabbed the gun, I turned and they gave me a quick, a quick look at me, before the boom, before he shot me."

C.S. jumped out of the car, got D. out, and took him inside the Hotel La Jolla to call 911. Detective Golden responded to the call, and testified that surveillance video from the Hotel La Jolla showed the "suspect ride up on a bicycle, drop the bicycle behind the Porsche, walk up where . . . the shooting occurs, and then he runs off southbound." Video from another officer's body-worn camera showed C.S. telling the officer that "[a] guy" just went "up to the car and shot my husband." C.S. said the man came from behind the car, "walked right up to the window . . . and started shooting. Then he tried to put it into my back window, but somebody came" and pushed the man away from the window. The shooter had a sock over the gun. C.S. added, "They call him Raymond T."[7] Another witness, T., told an officer that "Raymond T. just walked up," and described his appearance.

In his interview with police on July 11, 2017, Malloy acknowledged that his moniker or nickname was Raymond T.[8] He said he told D. that rather than harass Johnson, "come at me

_____

[7] On cross-examination, C.S. said that she did not know the name Raymond T.; she had heard it from "[p]eople on the streets."

[8] A recording of Malloy's interview was played for the jury.

first if you got a problem, before you concerning her."  But D. "didn't do that.  He sending waves, mixed signals, telling people . . . what he's going to do to me."  Malloy continued, "So I get off first.  I meant to blow his head off," and "I meant to finish him right then and there" but after the first shot, Malloy's revolver "kept spinning."  Malloy said again later, "Soon as he talks about what he gonna do to me, I get off first."  Malloy also noted that he had watched a video of when "I shot him in the face."  Malloy felt that D. had disrespected him: "If you know anything about gangbang, we all under the same umbrella.  Based on me coming and getting at D as a man, and telling him man, look here man, I can control her, let me know."  Nevertheless, D. had been "intimidating" Johnson, "but he can't" because "I'm her cover," "I'm her insurance, I'm he[r] shelter."  Malloy said, "I ain't gonna shed no tears about nothing.  You understand me? I get to him, and if I could take it back, I'd kill him."

At trial, Malloy testified that he had approached the car and asked, "Hey man, what's the problem with me and my girl being on Maple Street between 5th and 6th?"  Malloy testified that D. "looked at me and told me, 'You the nigga putting holes in my pocket.'  So he said, 'I got something for you.'"  Malloy testified that D. "went to reach for his glove compartment" and "what I saw in his hand was a black object.  I don't know if it was a gun, a knife, a phone, a wallet, but I know for a fact . . . what he's capable of doing, and I shot him."  On cross-examination, Malloy agreed that he tried to shoot D. a second time but the gun malfunctioned, and that he intended to "blow [D.'s] head off."  Malloy admitted that he said nothing about D. reaching for the glove box during his interview with police.  Malloy confirmed at trial that if he had the chance to do it again, he would kill D.

When asked if what he did was "righteous," Malloy responded, "I have the right to pursue my adversary until he no longer a threat."

C.S. testified that D. had to have surgery, and he was in the hospital for about a month. Detective Golden spoke with D. in the hospital two days after the shooting. D.'s jaw was wired shut, so he responded to questions by writing the answers. D. was not cooperative, and did not provide information about the incident. When asked about the shooting, D. wrote, "The streets will take care of it." When Golden suggested that D. would be investigated if the shooter was harmed, D. responded, "You'll never know who it is."[9] In his 2019 interview with police, D. said he had learned that Malloy told people that he was planning to shoot D. because "for him to hit me, it would make a name for him."

Malloy told police that he knew D. had survived the shooting, and while D. was in the hospital, "word is, you know, he's out to get me." Malloy continued, "So . . . I'm letting 'em people know . . . anybody that's dealing with D has gotta see me.

---

[9]     In his interview with police on December 3, 2019, D. said he did not help police after the shooting due to the "code of the streets." He later decided to talk to police while C.S. was facing criminal charges because "I'm out to help my wife, not you guys." The detectives made clear that they were not in a position to make any promises regarding C.S.'s prosecution, and D. said, "The DA have to make a decision fast or I'm going to get on the stand and I'm going to help him [presumably, Malloy] to beat his case." The court took judicial notice of C.S.'s February 2020 felony conviction for sales of a controlled substance (Health & Saf. Code, § 11352, subd. (a)). D. did not testify at trial.

Because it's not over." Malloy said that on June 18,[10] he and a friend, Rick, approached one of D.'s associates, Diamond, and told him to "Stay out my way. This don't have nothing to do with you bro. This is between me and Cookie D." He also said, "So I come down there, I'm hunting. Any Cookie D workers, and Cookie D— any, anybody that's had any association with him."[11] When D. was ready to leave the hospital, "I got people down there that . . . let[ ] me know. . . . He's ready to get out. He all right, he gonna live." "So it ain't over with. Based on where he's from, I send word to him to give him an ultimatum, we could do it Downtown or we could do it in your neighborhood, cause I'm from over there too." But "he don't send word back, he just tell a nigga to watch . . . his back. So I already know that he got four, five individuals he's paying."

Diamond later killed Rick in response to Malloy shooting D. At trial, Malloy testified that Rick was his "best friend." Diamond's legal name is Kenneth Johns, and Rick's legal name was Gerald Jackson. Rick/Jackson was killed on June 23, 2017; Diamond/Johns was convicted of the murder. (*People v. Johns* (Sept. 4, 2020, B296081) [nonpub. opn.].) The court took judicial notice of the conviction.[12]

---

[10] Malloy told police this conversation occurred on Father's Day. Sua sponte, we take judicial notice of the fact that in 2017 Father's Day was Sunday, June 18. (Evid. Code, §§ 452, subd. (h), 459.)

[11] On cross-examination, Malloy admitted that "hunting" meant killing someone.

[12] The trial court also took judicial notice that Diamond/Johns was convicted of stabbing victim P.S. near the Hotel La Jolla. In his interview with police, D. related that P.S. said, "'That son of a

10

D. told police that after Malloy shot him, "it traveled fast. And Rick . . . ended up getting killed [because] Rick was seen sheltering [Johnson] and [Malloy]." D. continued, "So word got to Rick, look leave that alone, you know what I mean? Leave that alone because you're putting yourself in a situation, you know what I mean? And he kept on, he kept on doing it, even paying their phone bills. And that's what led up to Rick getting killed." D. would not reveal to police who shot Rick. He said it was an "associate" but not someone "in my circle"; rather, "I take care of" people in the area, and in return people chose to "handle" things. D. said he did not ask the associate to harm Rick; "[i]t's one of these things where business needs to be handled. You don't need to say anything. He already knows."

When the prosecutor asked Malloy on cross-examination what he meant by "I get off first," Malloy answered, "[I]t's like chess, let you next move be your best move." The prosecutor asked, "The first move was [D.] making a threat, is that right?" Malloy answered, "Yes, ma'am." The prosecutor continued, "And the second move was you shooting him in the head; is that correct?" Malloy answered, "Yes, ma'am." The third move was D. having Diamond kill Rick, and the fourth move was Malloy shooting Oliver. Malloy testified that these were acts of war "[g]oing back and forth."

3. *Killing of Oliver*

Malloy shot Oliver on the morning of June 25, 2017 in an alley near 4th Street and Wall Street. At trial, Malloy testified

---

bitch is still living,' talking about me." D. said this was "a bad choice of words," which is "what got him dealt with." No evidence was introduced to connect this stabbing with Malloy or the Malloy/D. conflict.

that he and Johnson were in the alley sitting in chairs, and there were 16 additional people in the alley at the time. Malloy testified that he did not see Oliver enter the alley. Malloy told police that D. "has workers," and "the boy in the alley, he's one of those flunkies." Malloy testified at trial that he "knew for a fact" Oliver was a D. flunky "because the simple fact he stayed in a tent that was owned by" D. Malloy told police that he "talked to some people, and they tell me, they say . . . he's one of Cookie D's flunkie[s], but the boy can't hear, he's deaf . . . and he's a panhandler." At trial, Malloy testified that he had also heard that Oliver was partially blind.

After Oliver entered the alley, he talked to a woman named Ebony for a few seconds, Ebony pointed in the direction of Malloy and Johnson. Oliver began to walk toward Malloy and Johnson. Malloy testified that as Oliver approached, "I asked him, 'Hey man, where are you going?' And he kept on coming toward me. And I said, 'Man don't walk up on me,' and he kept on coming." Malloy estimated that Oliver was about 20 feet away when Malloy first said, "Don't walk up on me." Oliver asked Malloy if he could buy a $5.00 rock; Malloy responded that he does not sell rocks, and he said at trial that Oliver "knew better."

Malloy testified that Oliver continued to walk toward him. Malloy said in his interview with police, "I tell the dude, Say man, back up. . . . I asked that dude three times. I asked him three times, Man, don't walk up on me. Don't walk up on me. Don't walk up on me." Malloy said he was high at the time, but he was "paying attention to my surroundings." Malloy told police that as Oliver was advancing "[m]y back is on the wall," and Malloy was protecting "four females" who were also in the alley and "I feared for my life just as well, you know?"

12

Malloy told police that "the boy that came in the alley had on a black hoodie. I tell him . . . The man "has on this black hoodie, and in the front of his black hoodie he has a bulge." Malloy testified that "this bulge in the front of his hoodie," was "hanging down," so it looked heavy, like Oliver had a gun.[13] When police asked if the man pulled anything out of his hoodie, Malloy responded, "I don't give him a chance," and added, "It's him, it's either me or him." At trial, Malloy agreed that Oliver never pulled anything out of his pockets or showed any type of weapon.

Malloy testified that when Oliver "got within arm distance and me and him locked eyes, that's when I shot him." Malloy initially said that when Oliver "got close enough to me and we locked eyes, that's when I pulled my gun out of my backpack and told him to back up off me. He didn't back up off me so I shot him." Malloy also testified that he pulled the gun, still within the sock, from the backpack and put it on his lap as Oliver was approaching. He also said he pointed the gun (still in the sock) at Oliver before Oliver reached arm's distance, and before Malloy said to "back up" or "don't walk up on me."

In his interview with police, Malloy emphasized that he never revealed the gun in the alley: "I never brandished it" and "nobody in the alley could say they seen me pull a gun." He admitted that he used the same revolver in both shootings. When defense counsel asked Malloy if he shot Oliver because he thought D. sent him to kill Malloy, Malloy said, "Yes, ma'am. I feared for my life, me and [Johnson]." He testified later, "I knew

---

[13] In closing arguments the prosecutor played video of Oliver walking into the alley, and questioned Malloy's testimony that Oliver's sweatshirt looked as if it had a bulge in it.

13

for sure that he was in the alley to do some harm to me and my girl."

In response to a call, police officers found Oliver on the ground with a gunshot wound to his temple. Oliver was flailing and trying to move; paramedics transported him to the hospital. Oliver had been shot through the left temporal region of his head; there was an exit wound in the left back of his head. He lived for seven days in the hospital before succumbing to his injury. Oliver's clothing was removed and collected at the scene; he had a phone, but no other items or weapons.

Video played for the jury showed Malloy and Johnson between about 6:00 a.m. and 7:30 a.m. Malloy and Johnson entered the alley where the shooting occurred, where they stayed for less than an hour. Video showed Oliver walking into the alley at about 6:59 a.m. At 7:01, Malloy quickly left the alley on a bicycle, followed by Johnson. Malloy and Johnson traveled together for several blocks, passing an awning on Boyd Street. Following a tip, police officers found a bag on top of the awning. The bag contained a Smith & Wesson .38 caliber revolver inside a black sock, which had holes in it. The gun was loaded with four live rounds, and contained a spent casing. The gun and sock were shown to the jury.

In his interview with police, Malloy said, "I'm not going to stop bro, until I get everybody—and I believe in the stand your ground law." He also said, "[Y]ou see anybody enemy, I'm gonna knock 'em down." Malloy said there were "a couple more dudes out there that . . . I'm still hunting for, you know? And uh, like I told him, . . . if you want to play that game . . . there's going to be consequences [that] go along with it." Malloy said he was not going to "check my tail for a rat," because "How long you gonna

14

be a bitch?  Fuck that man."  Malloy also said,  "I know the boy Cookie D gonna do something to" Johnson, and "as long as I'm, I'm free, he gonna hunt me, I'm gonna hunt him.  Anybody got anything dealing with him" and "the hunt won't stop here."

In D.'s interview with police the detectives asked, "What was the deal with the guy in the alley . . . ?" D. responded, "Paranoia, as far as with [Malloy]."  D. said he did not have firsthand knowledge, but he heard from someone who was there that "the guy walked too close to [Malloy] and [Malloy] shot him." D. said, "Out of paranoia, he killed the guy," but "that guy didn't have nothing to do with nothing."

On cross-examination, Malloy agreed that it was "righteous . . .to shoot someone who worked for Cookie D."  He also testified that the territory D. claimed "wasn't his territory.  He completely punked [Johnson] out of that."  Malloy continued, "It was [Johnson's] territory first," and D. "[b]ullied her out."

4.      *Additional defense evidence*

In addition to Malloy's testimony, the defense presented evidence that about $2,200 in cash was found in D. and C.S.'s car after Malloy shot D.  The defense also presented evidence that police located Malloy after his cell phone number came up during the investigation of Rick's murder.

The defense also called a witness, Paula Taylor, who testified that she had known Malloy for over 20 years and did not think of him as a violent person.  On cross-examination, Taylor also said Malloy was not a drug dealer.  Upon questioning, Taylor said that if she was aware Malloy had been convicted of selling drugs six times over the last 20-year period, it would not change her opinion that Malloy was not a drug dealer.  She also said that despite Malloy admitting to shooting people in the face and head,

15

it did not change her opinion that Malloy was not a violent person. Taylor also admitted that it had been more than four years since she last saw Malloy.

5. *Verdict and sentence*

After closing arguments, with respect to the shooting of D., the jury found Malloy guilty of attempted first degree murder (§§ 187, subd. (a), 664; count 1); possession of a firearm by a felon (§ 29800, subd. (a)(1); count 3); and shooting at an occupied motor vehicle (§ 246; count 5). With respect to the shooting of Oliver, the jury found Malloy guilty of first degree murder (§ 187, count 2) and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 4). As to counts 1, 2, and 5, the jury found true allegations that Malloy personally used and discharged a firearm, causing great bodily injury. (§ 12022.53, subds. (b), (c), and (d).)

The court sentenced Malloy to 85 years and eight months to life, calculated as follows: on count 1, a term of seven years to life plus 25 years to life on the firearm allegation under section 12022.53, subdivision (d); on count 2, a consecutive term of 25 years to life, plus 25 years to life on the firearm allegation under section 12022.53, subdivision (d); on count 3, a consecutive term of three years; on count 4, a consecutive term of eight months; and on count 5, a term of seven years, stayed under section 654. On the additional firearm enhancements under counts 1 and 2, the court also sentenced Malloy to 20-year terms (§ 12022.53, subd. (c)) and 10-year terms (§ 12022.53, subd. (b)), and stayed those sentences.

## DISCUSSION

## A. Sufficiency of the evidence as to count 2 (murder)

Malloy asserts there was insufficient evidence to allow the jury to find beyond a reasonable doubt the absence of imperfect

16

self-defense.  He also contends there was insufficient evidence of premeditation and deliberation to support the verdict for first degree murder.

When we consider whether sufficient evidence supports a verdict, we review the entire record in the light most favorable to the judgment, and determine whether it contains evidence that is reasonable, credible, and of solid value such that a reasonable jury could have found the defendant guilty beyond a reasonable doubt.  (*People v. Ware* (2022) 14 Cal.5th 151, 167.)  We presume the existence of every fact in support of the judgment the jury could reasonably have deduced from the evidence.  (*Ibid*.)  It is the exclusive province of the jury to determine the credibility of witnesses and the truth or falsity of the facts upon which a determination depends.  (*Ibid*.)

"'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict.'"  (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

1.   *Imperfect self defense*

Malloy asserts there was "insufficient evidence from which jurors could reasonably find beyond a reasonable doubt the absence of imperfect self-defense."  He acknowledges that the "jury was free to reject Malloy's statements, including his asserted fear of imminent danger."  Malloy argues, however, that "[t]he evidence beyond Malloy's statements did not permit an inference of another mental state at the time of the Oliver shooting."[14]  We disagree.

---

[14]    The jurors were instructed on self-defense, imperfect self-defense, and defense of another.

"The mental state required for the crime of murder is the existence of malice, which may be either express or implied." (*People v. Mumin* (2023) 15 Cal.5th 176, 190, citing §§ 187, subd. (a); 188.)  Under the doctrine of imperfect self-defense, when a jury finds that a defendant killed another person because the defendant actually, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice.  (*People v. Rangel* (2016) 62 Cal.4th 1192, 1226.)  "[B]ecause malice is absent when imperfect self-defense is present, the prosecution cannot prove malice without disproving imperfect self-defense."  (*People v. Schuller* (2023) 15 Cal.5th 237, 254-255.)  Thus, "when provocation or imperfect self-defense are at issue, the prosecution is compelled to disprove those circumstances beyond a reasonable doubt."  (*Id.* at p. 254.)  We nevertheless review for substantial evidence. (*People v. Cruz-Partida* (2022) 79 Cal.App.5th 197, 212.)

To support imperfect self-defense, the defendant must have believed he was in imminent danger of death or great bodily injury.  (*People v. Landry* (2016) 2 Cal.5th 52, 97.)  The doctrine is narrow, and applies only when the defendant has an *actual* belief in the need for self-defense and only when the defendant fears *immediate* harm that must be dealt with instantly.  (*Id.* at pp. 97-98.)  "To satisfy the imminence requirement, '[f]ear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice.  The defendant's fear must be of *imminent* danger to life or great bodily injury.'"  (*People v. Trujeque* (2015) 61 Cal.4th 227, 270.)

Substantial evidence supports the jury's conclusion that Malloy fired at Oliver without fear of imminent harm and an actual belief in the need for self-defense.  Evidence showed that

Malloy's actions were strategic and were intended to send a message. Malloy testified that it was important for him to "get off first" in his battle with D., and to that end, he bought a gun and bullets before finding D., sneaking up from behind him, and shooting him in the face. Malloy told police that he intended to kill D., and after D. survived the shooting, Malloy was "hunting" D.'s associates because "it's not over." Malloy also testified that the two shootings were "moves" in a "chess game"—shooting D. in response to D.'s threats, and shooting Oliver in response to Rick's death. He said these were acts of war "[g]oing back and forth." Malloy also said he would not "be a bitch" and continue to "check [his] tail for a rat." At trial, Malloy agreed that it was "righteous . . .to shoot someone who worked for Cookie D."

It was also undisputed that Oliver was unarmed at the time of the shooting, and that Oliver did not say anything threatening to Malloy, undermining Malloy's claim that danger was imminent. D. told police that Oliver had "nothing to do with nothing," and that Malloy shot Oliver out of paranoia. Malloy testified that Oliver approached him asking about buying drugs, and because Oliver "knew better," Malloy presumed that Oliver intended to kill Malloy. The jury was free to find Malloy's explanation of the situation not credible, given the ample evidence that Malloy was engaged in an ongoing "war" with D., he was "hunting," D.'s associates, and he called Oliver's killing a "move" in the game. (See *People v. Mumin, supra,* 15 Cal.5th at p. 202 ["'it is the exclusive province of the . . . jury to determine the credibility of a witness'"].)

Even if the jury had concluded that Malloy was in fear of Oliver, there was substantial evidence that Malloy did not act out of fear *alone.* A defendant is not entitled to claim self-defense

19

where "he did not act on the basis of fear alone but also on a desire to kill his rival." (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1044.) As the Supreme Court discussed in *Nguyen*, a claim of self- defense "is not available when a person does not act out of fear alone, but out of fear and a desire to harm the attacker." (*Id.* at p. 1045.) Malloy himself said he was "hunting" D.'s associates, suggesting that he was willing to harm any associate of D. if the opportunity presented itself. After Oliver's shooting, Malloy told police that he was "still hunting," and "as long as I'm, I'm free, he gonna hunt me, I'm gonna hunt him. Anybody got anything dealing with him," and "the hunt won't stop here." Thus, substantial evidence supports a finding that even if Malloy did fear Oliver as he approached Malloy in the alley, Malloy also intended to take him down as part of his "war" with D.

We therefore conclude the prosecution satisfied its burden of disproving imperfect self-defense beyond a reasonable doubt, and that substantial evidence supports the jury's verdict.

2. *Deliberation and premeditation*

Malloy also contends there was insufficient evidence that Oliver's murder was deliberate and premeditated, and therefore he should not have been convicted of first degree murder. He asserts there was "no evidence of the requisite planning activity—facts related to [Malloy's] conduct before the shooting that reflected a pre-existing intent *to kill Oliver*." Malloy argues that he did not pursue Oliver or plan their meeting, and "there was no evidence of a motive to kill Oliver." We find that substantial evidence supports the verdict.

"Deliberation" refers to careful weighing of considerations in forming a course of action, and "premeditation" means thought over in advance. (*People v. Pearson* (2013) 56 Cal.4th 393, 443.)

20

"'"An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse."' [Citations.] 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .' [Citation.] Such reflection may be revealed by planning activity, motive, and the manner of the killings, among other things." (*People v. Potts* (2019) 6 Cal.5th 1012, 1027.)

Here, Malloy told police he was "hunting" D.'s flunkies, making clear that he intended to harm people Malloy perceived as working for D. Malloy armed himself for this purpose, and kept the gun hidden in a sock in his backpack. Malloy testified that as Oliver approached him in the alley, Malloy took the gun out of the backpack, still concealed in the sock, and put it in his lap, suggesting that he was planning to kill Oliver if he got closer. (See, e.g., *People v. Salazar* (2016) 63 Cal.4th 214, 245 [retrieving a loaded gun demonstrates planning and preparation].) Oliver never threatened Malloy or showed a weapon, and Malloy told police he did not want to "give [Oliver] a chance" to draw a weapon, because "it's either me or him," suggesting that Malloy intended to kill Oliver because Malloy recognized him as someone associated with D.

Moreover, Malloy said killing Oliver was a "move" in a war or game of chess that had spanned several weeks, indicating that Malloy had been considering killing any of D.'s associates long before Oliver walked into the alley. Malloy argues there was no evidence of "unresolved animosity" between Malloy and Oliver specifically, and notes that Malloy approached Diamond, one of D.'s flunkies, without killing him. However, Malloy said he was

21

with Rick when he approached Diamond on June 18; Diamond killed Rick on June 23. Malloy testified at trial that Rick's death was the third "move" in his war with D., and Malloy killing Oliver was a retaliatory fourth "move." Thus, the fact that Malloy once approached Diamond without killing him does not support a finding that, following Rick's death, Oliver's murder was not deliberate and premeditated.

Malloy relies heavily on *People v. Wear* (2020) 44 Cal.App.5th 1007 (*Wear*), in which the court found insufficient evidence of premeditation and deliberation. In that case, the defendant, Wear, "arranged to meet an acquaintance, Ryan Rossknecht, and went to the meeting with a friend, Brandon Lowell. Wear apparently intended to buy or steal a gun from Rossknecht and possibly to supply him with heroin. The evidence suggested that an argument arose during the meeting, and Rossknecht, who had two guns with him, shot Lowell once with one of them. Wear, who was unarmed, then seized that gun, shot Rossknecht twice with it, and fled with the other gun. Lowell and Rossknecht died of their injuries." (*Id*. at p. 1009-1010.) The jury found Wear guilty of murdering Rossknecht, and on appeal, Wear argued the evidence was insufficient to support this conviction "on either of the theories presented: felony murder during a robbery and premeditated murder." (*Id*. at p. 1010.)

Regarding premeditation and deliberation, the Court of Appeal held that the evidence did not support Wear's conviction. A text message suggesting animosity between the men was presented at trial out of context, and the Court of Appeal held that the "message cannot reasonably be construed as evidence that Wear planned to kill Rossknecht when considered in its context." (*Wear, supra*, 44 Cal.App.5th at p. 1025.) The court

22

acknowledged there was "some evidence of motive here.  It was essentially undisputed that Wear and Rossknecht knew each other and had some sort of falling out that may have been unresolved at the time of the shootings." (*Id*. at p. 1029.)  The court stated, however, "The expression of an intent to kill must be considered in context, and the fact that a defendant at one time wished to kill the victim, without more, does not permit a reasonable inference that the defendant's eventual killing of the victim was deliberate and premeditated." (*Ibid*.)  The court also stated that "there was strong evidence that Wear *did* kill Rossknecht impulsively, shooting Rossknecht with Rossknecht's own gun only after Rossknecht shot Lowell in the course of an argument." (*Id*. at p. 1031.)

Malloy argues there is less evidence of premeditation and deliberation here than in *Wear*.  He asserts that Malloy did not plan to meet, follow, or pursue Oliver.  But lack of planning to meet or follow Oliver specifically does not negate Malloy's clear statements that he was "hunting" people associated with D.  He also asserts "there was no evidence of a motive to kill Oliver," but this argument is directly contradicted by Malloy's own statements that Oliver was one of D.'s associates and his killing was in response to Rick's murder.  Overall, we find the reasoning of the *Wear* case inapplicable to the facts here, and that substantial evidence supports the jury's verdict.

## B.  Firearm possession conviction

Malloy contends that one of his two convictions for felon in possession of a firearm must be reversed because he possessed the same firearm over a single continuous period.  The People concede that one of these convictions must be reversed, and we agree.

23

"[P]ossession of a firearm by a felon is a continuing offense," so "'only one violation occurs even though the proscribed conduct may extend over [an] indefinite period.'" (*People v. Mason* (2014) 232 Cal.App.4th 355, 365.) As the People acknowledge, Malloy was charged with possessing the same firearm on June 5 and June 25, and there was no evidence of a break in possession, so one of the two convictions under section 29800, subdivision (a)(1) should be reversed. We therefore reverse Malloy's conviction on count 4.

## C. Findings under section 12022.53, subdivisions (b) and (c) on count 5 (shooting at an occupied vehicle)

Malloy notes that for count 5, shooting at an occupied vehicle (§ 246), the jury found true firearm allegations under section 12022.53, subdivisions (b), (c), and (d). However, only section 12022.53, subdivision (d) specifically refers to section 246: "[A] person who, in the commission of a felony specified in . . . Section 246 . . . personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death, to a person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." By contrast, section 12022.53, subdivisions (b) and (c) apply only to felonies specified in subdivision (a) of that statute, which does not include section 246.

Malloy therefore argues, and the People agree, that the jury's true findings on count 5 under section 12022.53, subdivisions (b) and (c) must be stricken. We concur, and order the findings stricken.

## D. Remand for resentencing

At the time Malloy was sentenced, the law provided that where a statute specified three possible terms of imprisonment

24

(lower, middle, and upper), the trial court had broad discretion to select the term that best served the interests of justice.  (Former § 1170, subd. (b); Former Cal. Rules of Court, rule 4.420(e); *People v. Sandoval* (2007) 41 Cal.4th 825,847.)  Effective January 1, 2022, Senate Bill 567 altered the determinate sentencing law by amending section 1170, subdivision (b), to make the middle term the presumptive sentence in the absence of specified circumstances.  (Stats. 2021, ch. 731, § 1.3, adding § 1170, subd. (b)(1), (2); *People v. Flores* (2021) 73 Cal.App.5th 1032, 1038.)  The trial court may impose the upper term only where there are circumstances in aggravation and such circumstances have been found true beyond a reasonable doubt or are stipulated by the defendant.  (§ 1170, subd. (b)(2); *People v. Lopez* (2022) 78 Cal.App.5th 459, 464.) The amendments to section 1170 apply retroactively. (*Flores, supra*, at p. 1039.)

Malloy asserts that he is entitled to remand for a new sentencing hearing under the revised section 1170, subdivision (b).  The People concede that remand for resentencing is appropriate.  We agree, and therefore remand the case for resentencing.

The parties further agree that at the time of resentencing, the trial court should consider two additional changes to the law.  First, when Malloy was sentenced, section 654, subdivision (a), required that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment[.]"  Effective January 1, 2022, Assembly Bill 518 amended section 654 by removing the requirement that a defendant be punished under the provision providing for the longest term of imprisonment, and granting the trial court

discretion to impose punishment under any applicable provision. (Stats. 2021, ch. 441, § 1.) Section 654, subdivision (a) now provides, "[a]n act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions[.]"

The trial court sentenced Malloy to an indeterminate term on count 1 (attempted murder), and under former section 654, stayed the determinate term on count 5 (shooting at an occupied vehicle). Malloy asserts, and the People concede, that the revised section 654 will apply upon resentencing.

Second, section 1385 was amended by Senate Bill No. 81 (2020-2021 Reg. Sess.) (Stats. 2021, ch. 721, § 1) to specify factors that the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice. Here, the trial court sentenced Malloy to terms of seven years to life with a 25-year enhancement on count 1 (attempted murder), and 25 years to life with a 25-year enhancement on count 2 (murder). The parties agree that upon resentencing, the current version of section 1385 will apply to the sentencing of counts 1 and 2.

## DISPOSITION

Malloy's conviction on count 4, possession of a firearm by a felon (§ 29800, subd. (a)(1)) is reversed. The true findings on count 5 under section 12022.53, subdivisions (b) and (c) are stricken. The judgment is otherwise affirmed. Malloy's sentence is vacated, and the matter is remanded for resentencing in accordance with sections 1170, 654, 1385, and any other statute applicable at the time of resentencing.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

CURREY, P.J.

MORI, J.